GEORGE D. SPIERS, DOING BUSINESS AS THE PAYNE-SPIERS STUDIOS *v.* UNITED STATES (GEORGE L. PAYNE, PARTY IN INTEREST) (No. 5019) [1]

United States Court of Customs and Patent Appeals, July 6, 1960

*Barnes, Richardson & Colburn* (*Joseph Schwartz*, trial attorney, of counsel) for appellant.

*George Cochran Doub*, Assistant Attorney General, *Sharretts, Paley & Carter* (*Howard C. Carter*, of counsel) for appellee.

[Oral argument April 7, 1960, by Mr. Schwartz and Mr. Carter]

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and JUDGE WILLIAM KIRKPATRICK. [2]

Rich, Judge, delivered the opinion of the court:

Appellant, an American manufacturer of stained glass windows, protested, under section 516(b), Tariff Act of 1930, the action

[1] C.A.D. 742.

[2] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge O'Connell*, pursuant to provisions of Section 294(d), Title 28, United States Code.

of the collector in admitting free of duty a stained glass window imported by appellee, George L. Payne. The collector's action was based on paragraph 1810 (of the free list) of the Tariff Act of 1930, the pertinent part of which reads:

Par. 1810. Works of art, * * * including stained or painted window glass or stained or painted glass windows which are works of art when imported to be used in houses of worship, valued at $15 or more per square foot, * * *.

Appellant claims the imported window should be charged with duty under the following:

Par. 230(a) [as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, effective October 19, 1951, T.D. 52836]. Stained or painted glass windows, and parts thereof, not specially provided for * * * 30% ad val.

It was agreed by the parties that the stained glass window was imported to be used in a house of worship and that it was valued at $15 or more per square foot. The sole issue, therefore, is whether it is a work of art within the meaning of paragraph 1810. The United States Customs Court, Third Division, one judge dissenting, found that it is a work of art and overruled the protest.

It was stipulated that the window, which is said to depict the baptism of the infant George Washington and is about 4 by 8 feet in size, was produced in the following manner:

1. The window was produced and exported by the Studios of J. Wippell and Co., Ltd., at Exeter, England.

2. A water-color design, drawn on a scale of one inch to one foot, showing the subject of the window was created by Mr. Arthur Frederick Erridge, an artist commissioned to design and supervise the execution of this window by J. Whippell & Co., Ltd. The artist's water-color design was made into a full sized drawing in black and white, known as a cartoon, by Mr. Erridge himself.

3. The glass from which the window was made was cut by glass cutters following the lines of the cartoon made by Mr. Erridge. A "glazing drawing" was made by a draftsman from the cartoon by tracing over carbon paper and transferring the main lines of the drawing on the cartoon to a "glazing drawing". The glazing drawing was subsequently used by the lead workers who were to lead the pieces of glass together.

4. The colors of the glass were selected by Mr. Erridge, partly from glass on hand at the Studios and partly from colors ordered from the glass factory, in tones to match the color of the water-color design.

5. The pieces of glass making up the ensemble of the window were then painted under the supervision of Mr. Erridge, after he had prepared a sample palette of the shading and tone for the use of his three assistant glass painters. These assistants were Mr. B. Endacott, Mr. K. Croker, and Mr. Charles Lamb. Each glass painter is a specialist in one phase of the work; one specializes in the painting of the heads of the figures, another in creating the drapery lines and folds, and the third in ornamental detail.

6. These painted pieces were then fired in a kiln built specially to properly fuse the paint and the glass.

7. The pieces of glass were then placed upon the glazing drawing by a glazier who inserted narrow strips of lead, known as cames, between the various pieces.

8. The joints formed by the lead cames were then soldered, the entire window was then cemented on both sides to make it watertight, and the window was then shipped.

9. The operations described in paragraphs 6, 7, and 8 were all performed under the supervision of Mr. Erridge and necessary corrections were made in accordance with his directions.

The following additional facts were also stipulated:

* * * Mr. Erridge attended the Central School of Arts and Crafts [in London] from 1914 to 1918 studying a course in stained glass, life and antique church decoration and design. He received a diploma and is a Fellow of the British Society of Master Glass Painters (F.B.S. of M.G.P.).

He was a pupil of James Hogan, the well-known designer of the windows installed in St. Thomas Church at Fifth Avenue and 53rd Street, New York City, and the Church of the Transfiguration at 1 East 29th Street, New York City. He started designing stained glass windows in 1920. He has exhibits at the Lambeth Exhibition of Church Art, the Central Council for the Care of English Churches, The Exeter Art Society, and the Exmouth Art Group.

These exhibits consist of oil paintings, water-colors, stained glass and church furnishings. Mr. Erridge is listed in "Who's Who in Art" and described as an artist and designer in stained glass, ecclesiastical furnishings, an artist in oil paintings, tempera water-color and a designer in leaded glass and embroidery.

* * * the glass used in producing the stained glass window in suit was entirely hand-blown, not rolled glass, known as "Hand-Blown Antique Glass."

* * * Mr. B. Endacott, had 30 years experience in glass painting, including at least 4 years of apprenticeship to a stained glass artist, and who has also done modeling and sculpturing.

* * * Mr. K. Croker, [is] a graduate of Exeter Art School and the holder of two diplomas from the British Society of Master Glass Painters, [and] a pupil of Mr. Erridge for 16 years, and that he has also produced paintings in watercolors; and

* * * Mr. Charles Lamb was a student of James Hogan and a graduate of The Central School of Arts and Crafts, and that he has had experience in glass painting with many firms in London.

Six expert witnesses were called, four by appellant and two by appellee. Of these only two, both of whom testified for appellant, had actually seen the window. The other four testified on the basis of color photographs of it, and such a photograph is in evidence as an exhibit. Appellant's witnesses were of the opinion that the window is not a work of art, and stated their reasons for such opinion, whereas appellee's witnesses were of the opinion that it is such a work, and also stated their reasons. While the background and experience of the witnesses varied considerably, all of them appear to have been properly qualified to express "expert" opinions on the merits of art works, that is to say value judgments and also what the term "work of art" means to them as artists.

Appellant points out that the only two witnesses who had seen the window were of the opinion that it was not a work of art and contends that their testimony cannot be overcome by that of others who based their opinions only on photographs. The following three cases are cited by appellant in support of that proposition: *United States* v. *Mrs. Adelaide Ehrich*, 22 CCPA 1, T.D. 47019; *O. O. Friedlaender Co.* v. *United States*, 19 CCPA 198, T.D. 45295; *Marshall Field & Co.* v. *United States*, 5 Ct. Cust. Appls. 191, T.D. 34324.

The purport of the cited cases is that photographs do not always accurately reproduce all aspects of the thing depicted and may, in some cases, be insufficient, standing alone, to afford a proper basis for determining whether an object is a work of art. It is to be noted that those cases involved three-dimensional objects and that it does not appear that the photographs were colored. Most likely, by reason of the dates, they were not since color photographs of the type here utilized are of relatively recent origin.

In the instant case the window is, in its visual effect, two-dimensional and the questioned testimony was based on a color photograph. Obviously, in such a case, the photograph gives a much better idea of the appearance of the original than does a single black and white photograph of a three-dimensional object which, at best, shows its appearance from one angle only and varies with the kind of lighting used. But there is nothing to a window beyond color and design. Moreover, only one of the two witnesses who had seen the window indicated that its appearance was not accurately reproduced in the photograph which is in evidence. The only reason he gave in support of that allegation was that the faces in the photograph "seem to be brown or reddish, whereas in the window itself they are black." He later explained he meant the faces in the window "were in black and white" rather than in "brown and whitish yellow" as the photograph appeared to him to show them. We agree with the majority of the Customs Court that this testimony of the witness can be accorded little weight. If what he remembered as black in the faces of the characters had a brown cast in the color photograph, we do not see that it is a difference of any importance on the issue before us. It is not to be expected that a color photograph is 100% accurate in color rendition. ■ Finally, the photograph which is in evidence and which was referred to by the witness was introduced in evidence by appellant as "an actual photograph in colors of the window in question as it is now installed" and appellant, therefore, is not in a favorable position to contend that it is not a reasonably accurate reproduction. Whether this window is a work of art does not depend, in any event, on subtle details of color.

We conclude that under the circumstances of this case testimony based on the photograph alone is competent and is entitled to the same weight on the issue here as if based on actual inspection of the window.

The conclusion of appellant's witnesses that the window is not a work of art was based on their opinion that it is "banal" and "devoid of any aesthetic merit," and that it is not an "original" creation but an imitation of former treatments of similar subjects. They were also of the opinion that the fact that the actual painting on parts of the window was not done by Erridge, the artist who made the original painting, but by the "artisans" who assisted in the execution, disqualifies it as a work of art.

It is evident that the testimony as to banality and lack of originality or aesthetic appeal involves merely the personal opinions of witnesses on questions of aesthetics and artistic merit. Obviously a painting may have definite aesthetic appeal to some qualified persons in the field of art and may completely lack such appeal for others equally qualified. Apparently the more they know about art, the more violent and diverse are their opinions. As was said in *Mazer* v. *Stein*, 347 U.S. 201, 214, on a similar *legal* question as to what are "works of art" under the copyright law; "Individual perception of the beautiful is too varied a power to permit a narrow or rigid concept of art."

Similarly there may be distinct differences of opinion as to whether a painting is original or imitative. It is not contended that the window here involved is an actual copy of any earlier painting but merely that the treatment of the subject is conventional and similar to that of prior paintings of baptisms. It is to be expected that certain similarities will be found in ecclesiastical art between pictures of various baptisms, and there are many particulars of color, form and arrangement in which church windows commonly resemble each other. We see no reason why such similarities, in the case of any particular work, should disqualify it as a work of art. The same themes have been utilized by artists for centuries without disqualifying their productions as works of art.

We are unable to agree with appellant that the window is not a work of art because the actual painting on the glass was not done by the artist, Arthur Frederick Erridge, who conceived the design, made the original water-color painting and full-size cartoon and supervised the final production in all of its artistic detail. We are not concerned here with whether the final product may be considered the work of Erridge, but whether it is a work of art, the physical embodiment of an artist's creative concept. The previous training of the person or persons executing a painting may be relevant to that issue, but it is

certainly not controlling. Many works of art have been produced by persons of comparatively little formal training. Moreover, in this case the stipulations show that each of the persons who did the actual painting on the glass had had extensive study or apprenticeship in art, and it would clearly be improper to hold that any or all of them were incapable of producing a work of art.

It thus appears that if the window is held not to be a work of art it must be on the basis of an acceptance of the opinion of appellant's witnesses. We do not question the sincerity of their testimony, but the testimony of appellee's witnesses who are equally sincere is to the opposite effect, and their conclusion is fortified by ██ the presumption of correctness attaching to the collector's classification and by the fact finding of the majority of the Customs Court which should not be set aside unless clearly wrong. An examination of the photograph of the window, in the light of all the testimony, also convinces us that it is a work of art within the meaning of the applicable statute. We do not say this as art critics for we do not conceive that this case turns on the *value* of this window as a work of art, a matter which is within the province of the critic and the appraiser of art. The question here is whether this kind of a stained glass window falls within the category of "works of art" according to the common meaning of that term. We think we are as competent to judge that matter as are artists—perhaps more so—as it is simply a question of what kind of windows Congress wished to admit free of duty, not a question of how good the art is. Insofar as a value judgment is involved, which may depend in some degree on the quality of the art, Congress fixed the limiting factor, which is a value of $15 per square foot or more.

The judgment of the United States Customs Court is *affirmed*.